Filed 3/6/24  P. v. Son CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DOEUR MICHAEL SON,<br><br>    Defendant and Appellant. | D081583<br><br><br>(Super. Ct. No. SCD131901) |


APPEAL from an order of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

In 1998, Doeur Michael Son was convicted of the first degree murder of Sisouphanh Kamphila and the second degree murder of Chang Lee. She now appeals the trial court's summary denial of her petition for resentencing under Penal Code section 1172.6.[1] Son argues that the trial court's jury instructions on direct aiding and abetting liability (CALJIC No. 3.01) and conspirator joint liability (CALJIC No. 6.11) provided the jury with the opportunity to convict her of the crimes without finding she personally had the intent to kill the two murder victims, precluding the trial court from denying her resentencing petition at this early stage.

In response, the Attorney General argues that the jury instructions did not permit the jury to convict Son under a theory of imputed malice and the record of conviction conclusively establishes Son was convicted as a direct aider and abettor, who personally harbored intent to kill. Further, the Attorney General argues that the jury's true finding on the multiple-murder special circumstance allegation makes her ineligible for resentencing on the first degree murder conviction as a matter of law.

As we shall explain, we agree with Son that the limited record of conviction available to the trial court at this initial stage of the proceeding did not establish Son's ineligibility for resentencing with respect to the second degree murder conviction. However, we agree with the Attorney General that the record, specifically the multiple-murder special circumstance instructions, conclusively shows Son's ineligibility with respect to the first degree murder conviction. Accordingly, the trial court's order denying the petition is reversed only with respect to Son's second degree murder conviction and remanded to the trial court with directions to issue an

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

order to show cause and hold an evidentiary hearing in accordance with section 1172.6, subdivision (d)(3).

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

The following is taken from this court's opinion in *People v. Son* (2000) 79 Cal.App.4th 224 (*Son*)[2]:

> "**A. The Killings**
>
> "Son and Mon Smann were friends and fellow members of the Crazy Oriental Crips gang.
>
> "On the night of February 1, 1992, Son and Smann invited Chang Lee and Sisouphanh Kamphila (Nick) to go out with them purportedly to pick up females. After Son and Smann got into the backseat of Lee's black Toyota Supra, Smann directed Lee and Nick to Skyline Drive in San Diego to pick up the girls.
>
> "Eventually, Smann told Lee and Nick to pull over beside Morse High School. However, no girls were there. Instead, Smann took out a Titan semiautomatic .25-caliber handgun and made Lee lie facedown on the school lawn. Smann shot Lee four times. Lee was also strangled before he died. Son then took Nick from the car and held Nick on the ground while Smann shot Nick four times. The killings were retaliatory in that Smann believed that Lee and Nick had robbed Smann's house on the previous Halloween.
>
> "**B. Son's Girlfriend's Brother Learns Details of Killings and Tells Police**
>
> "After the killings, Smann returned to Cambodia and escaped arrest. However, Son made inculpatory statements about the killings to Soeun Ricky Sim (Ricky), the brother of Son's girlfriend Kim Sim (Kim). Ricky had also overheard some of the

---

[2] This factual summary is included solely as background in order to provide context to the opinion. At the time of the trial, Son used male pronouns, but now uses female pronouns.

3

details of the killings when Smann was talking to Son about fleeing because police were looking for him. In October 1995 and December 1996, Ricky gave Detective Gallivan statements detailing Son's admissions about [her] participation in the killings.[3] Police also found Son's fingerprint on Lee's car.

**"C. Son's Postarrest Inculpatory Statements to Police**

"On October 9, 1997, at 5:45 a.m., Detective Gallivan arrested Son. Half an hour later, Gallivan began a four-hour interview with Son. Son denied having been present when the killings occurred. At 12:27 p.m., after Gallivan told Son's girlfriend Kim he believed Son was involved in the killings, Kim was taken into the interview room. Kim told Son she had told district attorney investigator Marquez some things about the killings. After speaking to Son, Kim was taken home by Gallivan and Marquez. Gallivan told Kim to contact him if Son contacted her and said [she] wanted to talk to police.

"A few hours later at 4:20 p.m., Kim paged Detective Gallivan and said she had Son on the line, Son admitted being present when Lee and Nick were killed, and Son wanted to talk to Gallivan. Gallivan taped his three-way conversation with Son and Kim. During that three-way conversation, Gallivan told Son there were no guarantees about what would happen if Son talked. Gallivan also asked Son to tell him what happened. Son stated: Smann killed the two victims because they had robbed Smann's house; Smann telephoned the two victims and invited them to go out with Son and Smann to pick up some girls; when the victims arrived in a black Toyota Supra, Son and Smann got into the car; Smann directed Lee and Nick to Skyline Drive to pick up the girls and told them to pull over by Morse High School; both victims were shot outside the car; Son held one of the victims while Smann shot such victim; Son held the victim because Smann told [her] to do so; Son feared Smann would also

[3] "Ricky told Detective Gallivan that the killings were a setup; Son and Smann picked up the victims; Smann pulled out a gun; the victims started running; Son grabbed and held the victims while Smann shot them; Smann used a .25-caliber handgun; and the shots were to the back of the head, neck and body."

4

shoot Son if Son let the victim go instead of holding him; and when Son and Smann had first entered the Toyota, Smann showed his gun to Son causing Son to believe that Smann was going to carry out his prior plan to kill Lee and Nick for having robbed Smann's house.

"After the three-way phone conversation, Detective Gallivan went to the jail and interviewed Son further. The interview was tape-recorded. During the interview Son stated: Smann told Son that Lee and Nick robbed Smann's house on Halloween when Smann was not home but Smann's parents were; either on that day or a week after the robbery, Smann told Son that Smann wanted to kill Lee and Nick because they had robbed Smann's house; Smann telephoned Nick and talked about picking up some girls; when Lee and Nick arrived, Son and Smann got into the backseat of the Toyota where Smann showed his .25-caliber handgun to Son; Smann told driver Lee to stop at Morse High School and then pulled the gun from his (Smann's) waistband; Smann took a rope out of his pocket and put it around Lee's neck; however, because Smann was unable to kill Lee with the rope, Smann shot Lee; meanwhile, Son and Nick stayed in the car; Smann told Son that if Nick escaped, Smann would shoot Son; and after Smann finished killing Lee, Smann had Son take Nick from the car and hold Nick while Smann shot Nick. Son also told Gallivan that Son had brought the rope and put it around the neck of one of the victims.

[¶] . . . [¶]

"In December 1997 by information, the People charged Son with two counts of murder while armed with a handgun. (§§ 187, subd. (a), 12022, subd. (a)(1).) The information also alleged Son committed multiple murders within the meaning of section 190.2, subdivision (a)(3).

"In October 1998 the matter came on for jury trial. Ricky testified he had given Detective Gallivan extensive statements about Son's admitting [her] involvement in the killings, but Ricky claimed his statements had been a lie since Ricky was mad at Son for impregnating Ricky's 13-year-old sister Kim and for cheating on Kim by also seeing other girls. However, Ricky was unable to explain why the details of the killings he gave Gallivan

5

closely matched the physical evidence and Son's later postarrest admissions. The People introduced into evidence Son's taped interviews with police and the transcripts of those interviews.

"Asserting an alibi defense, Son testified [s]he was with [her] girlfriend Tina when the killings occurred. In that vein, Son asserted [s]he was sure [s]he had gone to see a movie and cruise around Mission Beach with Tina on the night of the killings. However, on cross-examination Son testified [s]he did not know Tina's last name or where she could be found and had never told police or anyone else about Tina. Further, although initially testifying the movie started at 5:00 or 5:30 p.m., Son later testified [s]he could not remember if Smann and the two victims had left the front of [her] apartment about 6:00 or 7:00 p.m., testimony indicating that Son had not left for the movies by that time.

"Additionally, Son testified that [s]he made the inculpatory taped statements to Detective Gallivan because Gallivan promised Son and Kim that Son would serve only one year in county jail if Son admitted [her] involvement in the killings. Son also testified [s]he knew certain details about the killings because Gallivan had shown [her] photos of the victims. However, Son later acknowledged [s]he gave specific details about the killings during [her] three-way conversation with Gallivan and Kim, a conversation that occurred an hour before Son was taken to jail where, according to Son, Gallivan showed [her] the photos of the killings and told Son details.

"In rebuttal, Detective Gallivan and investigator Marquez testified they had not promised Son or Kim that Son would serve only one year in county jail if [s]he admitted participating in the killings. Marquez also testified that although Son said [s]he had been in Texas at the time of the killings, Marquez's investigation revealed Son was not in Texas at that time." (*Son, supra*, 79 Cal.App.4th at pp. 227–230, fn. omitted.)

As stated, a jury convicted Son of the first degree murder of Kamphila (§ 187, subd. (a)) and the second degree murder of Lee, and found true the allegation that Son was armed with a firearm during the commission of the

murders (§ 12022, subd. (a)(1)) and the multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)). Thereafter, the trial court sentenced Son to prison for life without the possibility of parole for the first degree murder conviction, plus one year on the firearm enhancement, and 15-years to life for the second degree murder conviction plus one year on the firearm enhancement. The court ordered the sentences to run concurrently.

Son appealed the convictions, arguing the trial court erred by denying his request for an involuntary manslaughter instruction based on the defense of "imperfect duress" and by preventing him from presenting expert testimony on coerced confessions. (*Son, supra*, 79 Cal.App.4th at p. 227.) This court rejected Son's arguments. We concluded the involuntary manslaughter instruction was not required because California law did not support the defense of imperfect duress and the defense did not operate to negate Son's specific intent to aid and abet murder. (*Id.* at pp. 232–240.) In addition, we concluded the trial court's refusal to allow Son's expert on false confessions was not error because there was no evidence before the trial court that police used any coercive tactics to obtain Son's confession. (*Id.* at pp. 240–241.)

B. *Petition for Resentencing*

In 2021, after the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), Son filed the underlying petition for resentencing asserting that she was not the actual killer and did not intend to kill or assist the actual killer in the commission of the murders. The People filed an initial response to the petition asserting that Son had failed to make a prima facie case for relief because the record of conviction showed Son was convicted as a direct aider and abettor of both murders. Thereafter, the trial court appointed counsel for Son.

At a hearing on the petition, Son's counsel acknowledged that Son's jury was not instructed on felony murder or "explicitly" on the natural and probable consequences doctrine. Counsel argued, however, that the conspiracy instruction, CALJIC No. 6.11, told "the jury that a coconspirator could be liable for the natural and probable consequence of any act by a coconspirator." Therefore, this instruction allowed Son to be convicted of implied malice murder under a natural and probable consequence theory. Son's counsel conceded that the argument was stronger for the second degree murder conviction than for the first degree murder conviction. The District Attorney responded that Son's jury could not have found her guilty of either murder based on a now-invalid theory of liability because a jury today would be instructed no differently under current law.

After the conclusion of the argument, the trial court denied the petition. The court found that even though the conspiracy instruction referenced natural and probable consequences, because the only crimes at issue in the case were murders, there was no possibility the jury imputed malice to Son for some other act the consequence of which was a killing. The court concluded that the jury instructions and the jury's verdict established as a matter of law that Son was convicted of both murders as a direct aider and abettor, and that Son intended to kill or directly aid the killings.

Son timely appealed from the court's order denying her resentencing petition.

DISCUSSION

I

*Senate Bill 1437*

"The Legislature enacted Senate Bill 1437 'to more equitably sentence offenders in accordance with their involvement in homicides.' (Stats. 2018,

8

ch. 1015, § 1(b).) The Legislature recognized, 'It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability.' (*Id.*, § 1(d).) With this purpose in mind, Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1(f).) Outside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' (*Id.*, § 1(g).)" (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).)

"Senate Bill 1437 altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' (§ 189, subd. (e).)" (*Curiel, supra*, 15 Cal.5th at p. 448.)

"Second, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice

9

aforethought' to be convicted of murder. (§ 188, subd. (a)(3).) 'Malice shall not be imputed to a person based solely on his or her participation in a crime.' (*Ibid*.) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine. ([*People v.* ]*Gentile* [(2020)] 10 Cal.5th [830,] 846.) '[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense). [Citation.] A nontarget offense is the natural and probable consequence of a target offense "if, judged objectively, the [nontarget] offense was reasonably foreseeable." [Citation.] The accomplice need not actually foresee the nontarget offense. "Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " ' (*Id*. at pp. 843–844.) Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. (*Id*. at p. 844.) The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime. (*Id*. at pp. 843–844.) Senate Bill 1437 ended this form of liability for murder." (*Curiel, supra*, 15 Cal.5th at p. 449.)

"Senate Bill 1437 also enacted former section 1170.95, which created a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel,*

10

*supra*, 15 Cal.5th at p. 449.)  Two years later, by the passage of Senate Bill No. 775 on October 5, 2021, the Legislature expanded the scope of the law "to encompass, among other things, murder convictions 'under the natural probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime.*' " (*People v. Langi* (2022) 73 Cal.App.5th 972, 978 (*Langi*).)  Senate Bill No. 775 also expanded the law to include those convicted of attempted murder under a theory of liability abrogated by Senate Bill 1437, codified "certain aspects of [the Supreme Court's] decision in [*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*)], and clarif[ied] the procedure and burden of proof at the evidentiary hearing stage of proceedings.  (Stats. 2021, ch. 551, § 1.)" (*Curiel,* at p. 449.)  Senate Bill No. 775 became effective on January 1, 2022.  (Stats. 2021, ch. 551.)  The following year, the Legislature renumbered section 1170.95 to section 1172.6 without substantive change.[4]  (Stats. 2022, ch. 58, § 10.)

The resentencing "process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)  "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' (§ 1172.6, subd. (c); [citation].)  If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may

---

4	For clarity, we refer to the renumbered statute, section 1172.6, throughout the rest of this opinion.

dismiss the petition. (See § 1172.6, subd. (c); [citation].)" (*Strong*, at p. 708.) If the petitioner states a prima facie case for relief, the court must issue an order to show cause and, in most cases, set an evidentiary hearing to determine whether to vacate the conviction, recall the sentence, and resentence the petitioner on any remaining counts. (§ 1172.6, subds. (c), (d)(1).)

"In determining whether the petitioner has carried the burden of making the requisite prima facie showing he falls within the provisions of section 1172.6 and is entitled to relief, the superior court properly examines the record of conviction, 'allowing the court to distinguish petitions with potential merit from those that are clearly meritless.' (*Lewis, supra*, 11 Cal.5th at p. 971.) However, 'the prima facie inquiry under [section 1172.6,] subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, " 'the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.' " ... "However, if the record, including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner.' " ' " (*People v. Patton* (2023) 89 Cal.App.5th 649, 655–656, fn. omitted, review granted June 28, 2023, S279670.)

"We independently review a trial court's determination on whether a petitioner has made a prima facie showing." (*People v. Harden* (2022) 81 Cal.App.5th 45, 52.)

12

## II

### *Analysis*

Son contends that the trial court erred by denying her resentencing petition because the jury instructions allowed her to be convicted on a theory under which malice was imputed to her based solely on her participation in a crime other than murder. Specifically, Son points to the aiding and abetting instruction, CALJIC No. 3.01, and the conspirator joint liability instruction, CALJIC No. 6.11.

### A

### *Jury Instructions*

The limited record of conviction in this case suggests that Son was prosecuted on the theory that she was a direct aider and abettor in the premeditated and deliberate murders of two victims.[5] The court instructed the jury as to the specific intent required for the murder charges using CALJIC No. 8.10, which defines murder. This instruction stated that "[e]very person who unlawfully kills a [human being] [with malice aforethought] is guilty of the crime of murder in violation of section 187 of the Penal Code. ... In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing [was done with malice aforethought.]"

---

[5]     The record of conviction before the trial court consists of the felony complaint filed against Son; the subsequent information, which removed the personal use firearm enhancement under section 12022.5, subdivision (a) contained in the complaint; the jury's verdicts finding Son guilty of the first degree murder of Kamphila, not guilty of the first degree murder of Lee, guilty of the second degree murder of Lee, and finding true the multiple-murder special circumstance allegation; minute orders from the verdict reading and sentencing hearing; the abstract of judgment; this court's opinion affirming the judgment; and the jury instructions.

13

Using CALJIC No. 8.11, which defined "malice aforethought," the court also instructed the jury on express and implied malice. The instruction told the jury that "[[m]alice is express when there is manifested an intention unlawfully to kill a human being.] [Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life]."

The jury was also instructed on first and second degree murder, with CALJIC Nos. 8.20 and 8.30. CALJIC No. 8.20, titled "Deliberate and Premeditated Murder," told the jury: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willful,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of consideration for and against the proposed course of action. [¶] The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by *a clear, deliberate intent on the part of the defendant to kill*, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." (Italics added.) The second degree murder instruction given to the jury, CALJIC No. 8.30, provided: "Murder of the second degree is [also] the unlawful killing of a human being *with malice aforethought* when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." (Italics added.)

14

With respect to aiding and abetting, Son's jury was instructed with CALJIC No. 3.01 that "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

With respect to conspiracy, the jury was instructed with CALJIC Nos. 6.10.5 and 6.11. CALJIC No. 6.10.5 told the jury: "[a] conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime but is not charged as such in this case."[6]

---

6    The instruction further stated: "In order to find a defendant to be a member of a conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one overt act. It is not necessary to such a finding as to any particular defendant that defendant personally committed the overt act [, if [he] was one of the conspirators when the alleged overt act was committed]. [¶] The term 'overt act' means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy. [¶] To be an 'overt act,' the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy. Nor is it required that the step or act, in and of itself, be a criminal or unlawful act."

The jury also was instructed with CALJIC No. 6.11 that "[e]ach member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or such declaration is in furtherance of the object of the conspiracy. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. [¶] A member of a conspiracy is not only guilty of the particular crime that to [her] knowledge [her] confederates agreed to and did commit, *but is also liable for the natural and probable consequences of any act of a coconspirator to further the object of the conspiracy*, even though that act was not intended as a part of the agreed upon objective and even though [she] was not present at the time of the commission of that act. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes." (Italics added.)

Finally, the jury was instructed on the multiple-murder special circumstance with CALJIC No. 8.80.1 that: "If you find [the] defendant in this case guilty of murder of the first degree, you must then determine if the following special circumstance [is] true or not true. The defendant has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree. [¶] The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true. [¶] [If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or [an aider and abettor] [or] [coconspirator], you cannot find the special circumstance to be true [as to that defendant] unless you are satisfied beyond a reasonable doubt *that such defendant with the intent to kill* [aided]

16

or [abetted] or [counseled] or [commanded] or [induced] or [solicited] or [requested] or [assisted] *any actor in the commission of the murder in the first degree.*"  (Italics added.)

B

*Langi & Maldonado*

Based on these instructions—particularly CALJIC No. 3.01 and the sentence in CALJIC No. 6.11 that "[a] member of a conspiracy is not only guilty of the particular crime that to [his] knowledge [his] confederates agreed to and did commit, *but is also liable for the natural and probable consequences of any act of a coconspirator to further the object of the conspiracy*, even though that act was not intended as a part of the agreed upon objective"— Son argues the jury was permitted to find she was an aider and abettor in the murders without finding she intended to assist in the killings.  (Italics added.)  She argues the jury could have concluded that she only intended to assist Smann with a separate criminal act, but still convicted her of the murders if the killings were the consequence of that act.  She asserts, "if another conspirator expressed the intent to kill, the jury could have imputed their intent to kill to [Son] as a coconspirator.  If a coconspirator acted to kill the victim, the jury could have imputed that act to [Son] as well, even if murder was 'not intended as part of the agreed upon objective.' "

In support of her argument, Son relies on *Langi, supra*, 73 Cal.App.5th 972, and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*), both cases that reversed the trial court's orders summarily denying section 1172.6 resentencing petitions.  The Attorney General responds that unlike the instructions in *Langi* and *Maldonado*, the jury instructions provided in Son's trial foreclosed the possibility the jury imputed malice to Son based on her

17

intent to assist Smann with another criminal act because the instructions made clear that the only criminal acts at issue in the case were the two murders. Thus, the Attorney General argues, the record of conviction establishes Son's own intent to kill as a matter of law, precluding an evidentiary hearing.

Both *Langi* and *Maldonado* bear similarities to Son's case. The appellant in *Langi* was one of four men who beat and robbed another group of men that resulted in a death. (*Langi, supra*, 73 Cal.App.5th at p. 975.) One of the four perpetrators punched one of the victims, who then fell "and hit his head, leading to his death." (*Ibid*.) In 2007, *Langi* was convicted of the second degree murder of the victim on the theory that he was the perpetrator who threw the arguably fatal punch or that he aided and abetted the killing.[7] (*Ibid*.) *Langi* filed a petition for resentencing, asserting that another perpetrator threw the punch that led to the victim's death, and that he was eligible for relief under section 1172.6. (*Ibid*.) The trial court summarily denied *Langi's* petition, finding that the record of conviction, specifically the appellate court decision that affirmed *Langi's* conviction, established that *Langi* was the actual killer as a matter of law, precluding relief under section 1172.6. (*Langi,* at p. 977.)

On appeal, *Langi* argued that the trial court erred by relying on statements in the appellate opinion to conclude he was the actual killer. The First District agreed with *Langi* on this issue, holding that the jury's verdict left open the possibility that *Langi* was convicted as an aider and abettor of

---

[7]    The prosecutor also argued that the victim was killed during the robbery and that *Langi* should be convicted of first degree felony murder. (*Langi, supra*, 73 Cal.App.5th at p. 977.) The jury, however, rejected this theory and found *Langi* not guilty of felony murder, but guilty of second degree murder, robbery, and battery. (*Ibid*.)

the killing, despite language in the appellate opinion suggesting *Langi* threw the deadly punch. (*Langi, supra*, 73 Cal.App.5th at p. 980.) The court then turned to the question—the same one presented in this case—of whether the jury could have convicted *Langi* as an aider and abettor " 'under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime.' " (*Ibid*.)

*Langi* noted two instructions were of central importance to the issue, CALJIC Nos. 8.31, on second degree murder liability, and 3.01, the same aiding and abetting instruction given to Son's jury. (*Langi, supra*, 73 Cal.App.5th at p. 981.) CALJIC No. 8.31 was substantially similar to the implied malice instruction, CALJIC No. 8.11, given in this case. The instruction told Langi's jury "that a killing is a second degree murder if '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (*Langi,* at p. 981.)

Langi argued that these "instructions permitted the jury to find him guilty of murder if it found that (1) the killing resulted from the actual killer's intentional act; (2) appellant aided and abetted that intentional act; and (3) the killer 'deliberately performed [the act] with knowledge of the danger to, and with conscious disregard for, human life'—whether or not *appellant* knew of or consciously disregarded the danger to human life. The instructions thus permitted the jury to impute malice to appellant based

19

solely on his participation in a crime, without having to find that he personally acted with malice." (*Langi, supra*, 73 Cal.App.5th at p. 981.)

The Attorney General argued that, under these instructions, the "jury could have found appellant guilty as an aider and abettor of second degree murder only if it found that he ' "kn[e]w and share[d] the murderous intent of the actual perpetrator" ' " and not under an imputed malice theory " 'based solely on that person's participation in a crime' because it was 'instructed that to convict appellant of murder it had to find that he acted with implied malice.' " (*Langi, supra*, 73 Cal.App.5th at p. 981.) In support of the argument, the Attorney General quoted "the part of the aiding-and-abetting instruction stating that an accomplice must act with 'the intent or purpose of committing or encouraging or facilitating the commission of the crime.' (CALJIC No. 3.01.)" (*Id.* at p. 982.) *Langi* rejected this analysis, holding the "language does not state that the aider and abettor must himself have known that the act he aided was life-threatening, or that he must himself have acted with indifference to human life." (*Ibid.*)

The *Langi* court concluded that "under the instructions that were given, the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not appellant intended to aid or encourage [the] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Langi, supra*, 73 Cal.App.5th at p. 983.) The court explained that the instructions were insufficient under current law because they did not explain that "to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice." (*Ibid.*) The court noted that "the standard aiding and abetting

20

instructions are ill suited to the crime of second-degree murder." (*Id.* at p. 982.) If "a trial court uses such an instruction without tailoring it to the specifics of [the crime of murder], the instruction creates an ambiguity under which the jury may find the defendant guilty ... without finding that he personally acted with malice." (*Ibid.*; see also *People v. Powell* (2021) 63 Cal.App.5th 689, 712–714 [clarifying the elements of directly aiding and abetting a second degree implied malice murder and explaining the standard aiding and abetting instruction fails to convey the elements].)

In *Maldonado*, the appellant was arrested for murder after police investigators discovered Maldonado told someone he stabbed the victim with the help of a friend, and "told another person the killing was a friend's idea and the friend stabbed the victim with appellant's help." (*Maldonado, supra,* 87 Cal.App.5th at p. 1259.) Maldonado was eventually convicted of first degree murder based on a theory of lying in wait, though the jury found not true a lying-in-wait special circumstance allegation. (*Id.* at p. 1260.) The jury was instructed on both premeditated murder and lying-in-wait murder. (*Ibid.*) Like here, the jury was not instructed on felony murder or the natural and probable consequences doctrine. (*Ibid.*) Also like here, the jury was instructed on both express and implied malice and on direct aiding and

21

abetting liability with CALCRIM No. 401, an instruction substantially the same as the version of CALJIC No. 3.01 given in Son's and Langi's trials.[8]

As in *Langi*, the *Maldonado* court noted that the aiding and abetting instruction was " 'not tailored for' aiding and abetting an implied malice murder" because it "refers to an intent to aid and abet a 'crime,' " when "the aider and abettor in fact needs to 'intend the commission of the perpetrator's *act, the natural and probable consequences of which are dangerous to human life*, intentionally aid in the commission of that *act* and do so with conscious disregard for human life.' " (*Maldonado, supra*, 87 Cal.App.5th at p. 1265, italics added.) *Maldonado* held that the instruction permitted the jury to conclude that the appellant aided and abetted a murder without finding that the aider and abettor himself harbored an intent, either express or implied, to kill: "[T]he jury was instructed that a person aids and abets a crime if 'he or she knows the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.' The murder by lying in wait instruction did not instruct the jury that the perpetrator needed to intend to

---

[8] The version of CALCRIM No. 401 given to Maldonado's jury stated: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] Number One, the perpetrator committed the crime; [¶] Two, the defendant knew the perpetrator intended to commit the crime; [¶] Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; [¶] And, Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime. If all of these requirements are proved the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor." (*Maldonado, supra*, 87 Cal.App.5th at p. 1264.)

cause death. While the perpetrator must have concealed his purpose from the victim, waited and watched for an opportunity to act, intentionally made a surprise attack from a position of advantage, and have lain in wait for a substantial enough duration to show a state of mind equivalent to deliberation or premeditation, the jury may have found the perpetrator's *purpose* was only to injure or intimidate the victim in a surprise attack. Thus, using *Langi's* reasoning, the jury could have construed the instructions such that, 'to be guilty as an aider and abettor of [lying in wait first degree] murder, appellant need only have intended to encourage the perpetrator's intentional act—in this case, [a surprise attack on the victim]—whether or not appellant intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing.' "[9] (*Maldonado, supra*, 87 Cal.App.5th at p. 1266.)

As in *Langi* and *Maldonado*, the same aiding and abetting instruction in combination with the malice instruction left open a slim possibility that Son could have been convicted as an aider and abettor of the murder of Lee without finding he personally acted with malice. Because the instruction was not tailored to the crime of murder, depending on how the case was prosecuted and defended, the jury could have found that Son intended to assist Smann with another crime, for example assault or threat, and then

---

[9] *Maldonado* held that the fact that the appellant was convicted of first degree murder, rather than second degree murder as in *Langi*, was "immaterial because ... first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill," thus *Langi*'s "analysis of the standard instructions for aiding and abetting an implied malice murder" applied. (*Maldonado, supra*, 87 Cal.App.5th at p. 1267.)

23

imputed malice from Smann to Son to find him guilty of second degree murder.[10]

Like the First District in *Maldonado*, "[w]e emphasize the jury was not *required* to construe the instructions in this manner.  The jury could have[, and perhaps did,] construe[] the instructions as requiring the aider and abettor know the perpetrator intended to commit the act *and* know the perpetrator acted with implied malice—in other words, know the perpetrator knew the act was dangerous to human life and deliberately disregarded the risk to life.  Thus, the jury could have construed the instructions as requiring that, to be guilty of aiding and abetting an implied malice [second degree] murder, appellant must have intended to encourage both the act and the perpetrator's deliberate disregard that the act was dangerous to human life and, in so doing, appellant acted with implied malice." (*Maldonado, supra*, 87 Cal.App.5th at pp. 1266–1267.)  However, at this stage of the proceedings on this limited record, Son must be afforded the opportunity to litigate the issue at an evidentiary hearing.

The Attorney General asserts *Langi* does not support reversal of the trial court's decision because, "unlike the jury in *Langi*, [Son]'s jury was not instructed on second degree implied-malice murder.  Rather, [Son]'s jury was instructed that '[m]urder of the second degree is also the unlawful killing of a

---

10    Although we cannot reach the issue at the prima facie stage on the limited record before this court, our prior opinion confirming the conviction casts doubt on such a theory.  The opinion suggests Son's only defense to the crime, which she confessed to and then recanted at trial, was imperfect duress, i.e., that she participated in the murders because she believed that Smann would harm her if she did not go along with his plans. (*Son, supra*, 79 Cal.App.4th at p. 231.)  If there was no evidence of other crimes contemplated by Son and Smann—something unclear in the current record— it appears likely that the prosecutor on remand could prove Son harbored the requisite intent to kill.

24

human being with malice aforethought when the *perpetrator intended unlawfully to kill* a human being but the evidence is insufficient to prove deliberation and premeditation.' " The Attorney General then argues that because this instruction, CALJIC No. 8.30, specified an intent to kill was required, there was no possibility Son's jury would find her guilty without finding she acted with malice. This argument, however, misconstrues the instruction when it is given in combination with the aiding and abetting instructions.

The flaw identified in *Langi* and *Maldonado*, that an aider and abettor can be convicted of murder based on imputed malice under the aiding and abetting instruction, is not nullified by CALJIC No. 8.30. Rather, that instruction states only that *the perpetrator* must act with intent to kill. If Son's jury convicted her on a theory of aiding and abetting by imputing Smann's implied malice to her, CALJIC No. 8.30 would not have corrected that insufficiency. The Attorney General's attempt to distinguish *Maldonado* fails for the same reason. Like these two cases, summary denial of Son's petition for resentencing of her conviction for second degree murder must be

reversed.[11]  The limited record in this case does not establish as a matter of law that she is ineligible for relief under section 1172.6 for this conviction.

---

[11]     In *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921 (*Berry-Vierwinden)*, this court affirmed the denial of a resentencing petition under section 1172.6 at the prima facie stage that was based on a similar instructional problem to the one presented here.  Our decision relied on the requirement in section 1172.6, subdivision (a)(3) that the petitioner must "establish that he ' "could not presently be convicted of murder or attempted murder *because of changes to Section 188 or 189 made effective January 1, 2019.*" ' " (*Id*. at p. 933, italics in the original.)  We concluded the alleged infirmity in the jury instructions could have been raised at the time of the petitioner's conviction and direct appeal under *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), which held that " ' "when guilt does not depend on the natural and probable consequences doctrine, ... the aider and abettor must know and share the murderous intent of the actual perpetrator." ' " (*Berry-Vierwinden, supra*, at p. 935.)  Thus, the petitioner's argument did not support reversal of the trial court's denial of her resentencing petition at the prima facie stage because any infirmity in the conviction was not created by Senate Bill 1437.  (See also *People v. Burns* (2023) 95 Cal.App.5th 862, 868 ["The Supreme Court's *McCoy* decision ... made clear that the direct perpetrator's mental state could *not* be imputed to an aider and abettor, whose mental state had to be independently evaluated"]; and *People v. Flores* (2023) 96 Cal.App.5th 1164, 1173 ["When Flores was convicted in 2010, a provocative act murder conviction required the defendant personally harbor malice, whether it was the defendant or an accomplice who committed the provocative act that caused the death."].)

Although not raised by the parties, we note that unlike *Berry-Vierwinden*, the timeline at issue in this case does not establish the law foreclosed Son's jury from convicting her of second degree murder without finding she shared the murderous intent of the perpetrator.  She was convicted in 1998 and this court issued its opinion affirming that conviction in 2000 (*Son, supra*, 79 Cal.App.4th at p. 230), the year before *McCoy* made clear that "a direct aider and abettor's 'mental state is her own; she is liable for her mens rea, not the other person's.' (*McCoy, supra*, 25 Cal.4th at p. 1118.)" (*Berry-Vierwinden, supra*, 97 Cal.App.5th at p. 935.)

*Conspiracy Instructions*

We do agree with the Attorney General that the conspiracy instructions given to the jury did not create the same risk that Son would be convicted of murder on a conspiracy theory without the jury finding Son herself had the requisite intent to kill. As the Attorney General points out, the conspiracy instruction was specifically tailored to the crime of murder. CALJIC No. 6.10.5 told the jury: "[a] conspiracy is an agreement between two or more persons with the specific intent to agree *to commit the crime of murder*, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime but is not charged as such in this case." (Italics added.) This instruction made clear to the jury that to convict Son of murder on the conspiracy theory, it was required to find she specifically intended to agree to commit the murders.

Son points to the language in CALJIC No. 6.11 that "[a] member of a conspiracy is not only guilty of the particular crime that to [his] knowledge [his] confederates agreed to and did commit, *but is also liable for the natural and probable consequences of any act of a coconspirator to further the object of the conspiracy ....*" (Italics added.) She asserts this statement allowed the jury to convict her of murder under a conspiracy theory without malice. However, when read in conjunction with the tailored version of CALJIC No. 6.10.5, that possibility was foreclosed. If the jury convicted Son of the murders based on a conspiracy, a fact not knowable based on the present record of conviction, the jury necessarily found Son agreed with Smann to kill the victims. However, because the limited record of conviction does not establish on what theory Son was convicted, this conspiracy instruction does

not establish Son's ineligibility for relief as to the killing of Lee as a matter of law.  (See *Lewis, supra*, 11 Cal.5th at p. 972 ["In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'  ...  [T]he 'prima facie bar was intentionally and correctly set very low.' "].)

## D

### *Multiple Murder Special Circumstance*

Finally, as stated at the outset of this opinion, we agree with the Attorney General that the multiple-murder special circumstance jury instructions foreclose Son's resentencing petition with respect to the first degree murder conviction as a matter of law.  Son asserts the jury's true finding on the special circumstance allegation does not preclude her petition on either conviction because the jury could have interpreted CALJIC No. 8.81.3 "to mean that to find the multiple murder special circumstances true, it must be proven the defendant had been convicted of one crime of first degree murder, and at least one murder of the first or second degree, without requiring any specific intent or the intent to commit a murder."

This assertion lacks merit.  As discussed, the primary instruction on the multiple-murder special circumstance allegation given to the jury, CALJIC No. 8.80.1, specifically addressed the intent of the *defendant*, not the perpetrator.  It stated, "If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or coconspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt *that such defendant with the intent to kill aided or abetted* or counseled or commanded or induced or solicited or requested or

28

assisted any actor *in the commission of the murder in the first degree*." (Internal brackets omitted and italics added.)  This instruction, as the Attorney General notes, "does not address the defendant's requisite intent for second degree murder."  However, the instruction specifically required the jury to find Son was either the actual killer, or if not, that she intended to aid and abet a first degree murder.  (See, e.g., *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45 ["When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant intended to kill the murder victims."].)  The jury's true finding on this allegation, therefore, shows the jury found that Son had the requisite intent to aid and abet the first degree murder of Kamphila.

CALJIC No. 8.81.3, which Son relies on, states: "To find the special circumstances, referred to in these instructions as multiple murder convictions, is true, it must be proved:  [¶] [The: defendant has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree."  This general instruction does not negate the jury's necessary finding under CALJIC No. 8.80.1 that Son intended to kill or intended to aid and abet the killing of Kamphila in order to find true the multiple-murder special circumstance allegation.

## DISPOSITION

The order denying Son's petition for resentencing is reversed as to the second degree murder conviction and affirmed as to the first degree murder conviction.  The matter is remanded to the trial court with directions to issue

29

an order to show cause and hold an evidentiary hearing on the petition as it relates to the second degree murder conviction.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

DO, J.